IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JOSEPH W. BENDER, ET AL.,
*On behalf of themselves and all others
similarly situated,*

       Plaintiffs,      OPINION AND ORDER

 v.

                  19-cv-29-wmc

STATE OF WISCONSIN, ET AL.,

       Defendants.

In this lawsuit, the named plaintiffs allege that the State of Wisconsin, Governor Anthony Evers, and Wisconsin State Public Defender Kelli Thompson are "fail[ing] to provide constitutionally required, effective legal representation to indigent people accused of crimes for which there is a possibility of incarceration" in violation of and the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Sections 7 and 8 of the Wisconsin Constitution. (Am. Compl. (dkt. #10) ¶ 1.) Plaintiffs also seek to represent a class of similarly-situated indigent persons. Presently before the court is defendants' motion to dismiss. (Mot. to Dismiss (dkt. #11) 1.) For reasons of comity and deference to the State of Wisconsin's administration of justice, this motion must be granted.[1]

ALLEGATIONS OF FACT[2]

The complaint identifies a dozen named plaintiffs, each of whom reside in

---

[1] Recently, proposed intervenor Michael O'Grady moved to join as a plaintiff in this case. (Dkt. # 23.) This motion will be dismissed as moot by virtue of this ruling.

[2] In reviewing a motion to dismiss under the Federal Rule of Civil Procedure 12(b)(6), the court

Wisconsin and have been state-court criminal defendants. While eligible for representation from the Wisconsin State Public Defender's Office (the "SPD"), each also waited for months before receiving counsel, delaying the progress of their cases and forcing them to appear in court without counsel, as well as otherwise disrupting their lives. Plaintiffs further seek to represent a class of

> all indigent persons who are now or who will be under formal charge before a state court in Wisconsin of having committed any offense, the penalty for which includes the possibility of confinement, incarceration, imprisonment, or detention in a correctional facility (regardless of whether actually imposed), and who are unable to provide for the full payment of an attorney and all other necessary expenses of representation in defending against the charge.

(Am. Compl. (dkt. #10) ¶ 119.)

The SPD is responsible for providing "effective legal representation to indigent people accused of committing crimes for which there is a possibility of incarceration." (*Id.* ¶ 27.) SPD staff attorneys have significant caseloads, preventing them from providing representation for all eligible defendants. Even when that is not the case, conflicts of interest can prevent the SPD from representing some eligible criminal defendants. To provide necessary representation in such instances, the SPD turns to appointed counsel from the private bar, who are compensated at $40/hour. *See* Wis. Stat. § 977.08. This compensation is the lowest in the country; indeed, it is so low that "private attorneys

---

"accept[s] as true all of the well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of" plaintiff. *Jakupovic v. Curran*, 850 F.3d 898, 902 (7th Cir. 2017) (internal citation omitted). In reviewing a claim for dismissal under Rule 12(b)(1), a similar standard applies. *See Bultasa Buddhist Temple of Chi. v. Nielsen*, 878 F.3d 570, 573 (7th Cir. 2017) ("A motion to dismiss under Rule 12(b)(1) tests the jurisdictional sufficiency of the complaint, accepting as true all well-pleaded factual allegations and drawing reasonable inferences in favor of the plaintiffs.").

2

actually lose money by taking on representation." (Am. Compl. (dkt. #10) ¶ 29.) As such, most experienced attorneys are generally unwilling to accept such appointments and even less-experienced attorneys are financially discouraged from accepting such appointments, except as a last resort.

Unsurprisingly, the SPD has then experienced difficulty in recruiting local attorneys to accept these appointments, especially in small, rural communities. For example, in far Northern Wisconsin counties like Ashland and Bayfield, 73% and 99% of SPD appointments, respectively, go to private attorneys from other counties. In such counties, the local SPD offices spent an average of 24 days contacting an average of 39 attorneys before finding a single private attorney willing to accept an appointment. In some cases, circuit courts have even resorted to "order[ing] an SPD staff attorney to make a special appearance for an unrepresented client," although this is likely "constitutionally inadequate legal representation" because the staff attorney lacks the time to prepare adequately for these hearings or even to meet with the defendant ahead of time. (*Id.* ¶ 46.)

Where the SPD cannot successfully recruit counsel, state circuit courts may appoint counsel at the expense of the county. Moreover, as the Wisconsin Supreme Court recently decided to increase the compensation for such court-appointed counsel from $70/hour to $100/hour, such appointments have further complicated the SPD's recruitment efforts, because private attorneys now have an increased incentive to decline its appointments in the hopes of an appointment by the court for a two or threefold increase in compensation. Wis. S. Ct. Order 17-06 (issued June 27, 2018, eff. Jan. 1, 2020). Although ultimately deciding that this rate increase was "reasonable and necessary," *id*. at 14, the Wisconsin

Supreme Court was sharply aware of the collateral effects of their decision to increase the rate for court-appointed counsel. Specifically recognizing the "interplay between the rate paid by the SPD and the court's rate in SCR 81.02," the court expressed their deep concern over the impact of SPD underfunding, yet "trust[ed] that the legislature will work with the courts, the SPD, the petitioners, the counties, and other justice partners to ensure adequate funding for the SPD that is urgently needed." *Id*. at 14-15.

As a result of the challenges the SPD faces in recruiting counsel, many criminal court proceedings must be repeatedly adjourned because indigent defendants do not yet have legal representation. In addition, because many indigent defendants lack the education necessary to represent or advocate for themselves effectively as to their right to a speedy trial, they remain incarcerated for long periods of time before proceedings even begin. In other cases, indigent defendants are forced to represent themselves at bail hearings, which can also result in long, unnecessary stays in jail because of their extended incarceration. Many criminal defendants also lose their jobs awaiting a bail hearing, a fact which no doubt further undermines requests for release.[3] Finally, extended incarceration adds to the already overcrowded jails, worsening the conditions for those defendants that are left languishing there.

Even indigent criminal defendants who *do* receive appointed counsel do not necessarily end up with adequate representation. First, the low compensation available

---

[3] Plaintiffs further allege that "this loss of employment means that many criminal defendants who could potentially afford private counsel at the outset of their confinement quickly become indigent, adding to the growing pool of clients who are entitled to legal counsel, but to whom it has not been provided by the State." (Am. Compl. (dkt. #10) ¶ 41.)

4

limits counsel's ability to engage in discovery, fact investigation, expert discovery, and trial preparation. Second, appointed attorneys tend to lack experience and are not provided training or mentorship from the SPD.

Despite having constitutional rights to effective counsel and a speedy trial, therefore, a "state of crisis" exists where indigent criminal defendants facing the possibility of incarceration "are simply not being promptly appointed the effective legal counsel mandated by the United States and Wisconsin Constitutions." (*Id.* ¶ 25.) Plaintiffs ultimately lay the blame for these problems with the State:

> The State of Wisconsin is the source of all these constitutional violations. The State issues the criminal charges. The accused who are detained before trial are imprisoned by the State. The State funds the SPD and sets the rate of compensation for appointed attorneys. The State is aware that among the rights of the accused are the Right to Counsel, the right to Due Process, and the Right to a Speedy Trial. However, the State's failure to sufficiently fund the SPD or adequately compensate private attorneys for their time has deprived the Plaintiffs, and all those similarly situated, of these constitutionally-mandated rights.

(*Id.* ¶ 49.)

OPINION

Plaintiffs argue that defendants' failure to provide effective legal representation to plaintiffs and other similarly situated indigent criminal defendants violates the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Sections 7 and 8 of the Wisconsin Constitution. (Am. Compl. (dkt. #10) ¶ 1.) To remedy these alleged violations, plaintiffs seek broad declaratory, injunctive and monetary relief. Defendants have moved to dismiss plaintiffs' claims on three grounds: (1) *Younger v. Harris,* 401 U.S.

37 (1971), and its progeny require the court to abstain; (2) the court otherwise lacks jurisdiction; and (3) plaintiffs cannot state a claim for damages. (Mot. to Dismiss Br. (dkt. #12) 4-6.)

As the Wisconsin Supreme Court acknowledged, the state's current public defender system is in need of urgent repair. Both overburdened and underfunded, the SPD is struggling to meet its obligation to provide effective and timely representation to all indigent criminal defendants. However troubling these problems are, defendants are generally correct to point out that this case is not properly resolved in this court under *Younger* and general principles of federalism, which prohibit federal courts from unduly interfering in the legitimate activities of the State of Wisconsin. Because plaintiffs' requested relief would require this court to do just that, defendants' motion to dismiss will be granted.

Specifically, defendants argue that *Younger* and its progeny require dismissal because: (1) "federal courts *must* dismiss equitable relief requests that would require them to reform and indefinitely audit state criminal proceedings"; (2) "any relief that federal courts could grant against state public defender officials would substantially interfere with state criminal proceedings and disrupt comity between the federal and state governments"; and (3) "[f]ederal courts have uniformly applied *Younger* to dismiss systematic constitutional challenges to the adequacy of state public defender systems." (Mot. to Dismiss Br. (dkt. #12) 13, 16 (emphasis added).) In response, plaintiffs contend that *Younger* does not apply because they are not asking this court to enjoin state criminal proceedings, but rather "demand[ing] their constitutionally-mandated rights to counsel,

due process, and speedy trials *in order to adjudicate state criminal proceedings*."[4] (Opp'n (dkt. #13) 2-5.) If anything, plaintiffs argue that *Younger* supports this court's exercise of jurisdiction, since Wisconsin has no "legitimate interest in denying the Plaintiffs their constitutionally-mandated rights" and "enforcement of those rights would be an act of respect for the state's true interests." (*Id.* at 6.) Finally, plaintiffs contend that abstention would be inappropriate because of the lack of any parallel, state-court proceeding. (*Id.* at 7.)

After the appellee in *Younger* was indicted in state court for violating the California Criminal Syndicalism Act, he filed a federal lawsuit seeking to enjoin the district attorney from prosecuting him because the prosecution and Act inhibited his First Amendment rights. 401 U.S. at 38-39. While the district court concluded that it had jurisdiction and enjoined the district attorney from continuing the prosecution, the United States Supreme Court reversed, finding that the injunction violated "the national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances." *Id.* at 40-41. As the Supreme Court explained, "the basic doctrine . . . that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Id*. at 43-44. The Court found this doctrine

---

[4] Even assuming they *were* asking for the court to enjoin state criminal proceedings, plaintiffs argue that the "special circumstances" exception recognized in *Younger* should apply because they cannot "begin defending against the relevant prosecutions in state court until they are appointed effective legal counsel." (Opp'n (dkt. #13) 6.) As defendants note, however, plaintiffs failed to address any of *Younger*'s progeny, including those in which federal courts have specifically dismissed challenges to state public defender systems. (Reply (dkt. #21) 6.)

showed "a proper respect for state functions," also referred to as "comity." *Id.*

Confronted with a request for an "injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials," the Supreme Court further recognized some three years later in *O'Shea v. Littleton*, 414 U.S. 488 (1974) that such an injunction "would contemplate interruption of state proceedings to adjudicate assertions of noncompliance by petitioners," comprising "nothing less than an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that *Younger v. Harris*, supra, and related cases sought to prevent." *Id.* at 500.[5] Accordingly, the Supreme Court found that "[a] federal court should not intervene to establish the basis for future intervention that would be so intrusive and unworkable." *Id.*

As the Court noted in *O'Shea*, such a sweeping injunction "would disrupt the normal course of proceedings in the state courts via resort to the federal suit," just like the relief requested in *Younger*, and enforcement would require "the continuous supervision by the federal court over the conduct of the petitioners in the course of future criminal trial

---

[5] There would appear to be an argument that the Supreme Court's holding in Part I of *O'Shea* undermines plaintiffs' claim to Article III standing to sue as well. *See* 414 U.S. at 493-99. As discussed in greater detail below, however, other courts have taken instruction from Part II of the *O'Shea* opinion. *See, e.g., Luckey v. Miller*, 976 F.2d 673, 679 (11th Cir. 1992), *reh'g denied*, 983 F.2d 1084 (11th Cir. 1993) ("In the view of this Court, laying the groundwork for a future request for more detailed relief which would violate the comity principles expressed in *Younger* and *O'Shea* is the precise exercise forbidden under the abstention doctrine."); *Gardner v. Luckey*, 500 F.2d 712, 715 (5th Cir. 1974) ("It is clear from the face of their complaint that our appellants contemplate exactly the sort of intrusive and unworkable supervision of state judicial processes condemned in *O'Shea*."); *Yarls v. Bunton*, 231 F. Supp. 3d 128, 132 (M.D. La. 2017) ("Any declaratory judgment or injunction entered by this Court would inevitably lead it to become the overseer of the Orleans Parish criminal court system, a result explicitly condemned by the United States Supreme Court in *Younger* and *O'Shea*.").

proceedings." *Id.* at 501. Likewise, requiring periodic reporting obligations "would constitute a form of monitoring of the operation of state court functions that is antipathetic to established principles of comity," as would the "continuing intrusion of the equitable power of the federal courts into the daily conduct of state criminal proceedings." *Id.* at 501-02.[6]

Relying on the Supreme Court's analysis in *Younger* and *O'Shea*, other federal courts have expressly concluded that federal lawsuits seeking to reform state public defender offices are inappropriate. *See Gardner*, 500 F.2d at 715 (affirming dismissal of class action suit alleging systematic failures of Florida public defender offices to provide constitutionally adequate representation under *O'Shea* and *Younger*); *Yarls*, 231 F. Supp. 3d at 129, 132 (dismissing challenge to Louisiana public defender systems "on comity and federalism grounds," because "[o]therwise the judiciary would be interfering with state criminal proceedings and run afoul of the balance struck between federal and state courts" through judgment, making it "the overseer of the Orleans Parish criminal court system," which is prohibited by *Younger* and *O'Shea*); *see also Bice v. La. Public Defender Bd.*, 677 F.3d 712, 718-20 (5th Cir. 2012) (affirming federal-court abstention where plaintiff challenged $35 fee for criminal defendants who were convicted, pled guilty or pled nolo contendere to fund the public defender's office because an injunction would interfere in state proceedings since: (1) plaintiff's criminal prosecution "would likely be halted until the

---

[6] Indeed, as alleged, some of the named plaintiffs and putative class members are currently involved in state criminal proceedings, and for those who are not, the risk of future injuries may be "too speculative" to make out an Article III controversy. *Gardner*, 500 F.2d at 714.

9

Board determines a way to fill the funding gap"; and (2) the state municipal court could address his claim by enjoining collection of the fee as to plaintiff himself).

Here, plaintiffs seek broad equitable relief, asking the court to:

1. "Declare that the State of Wisconsin is obligated to provide constitutionally adequate representation to indigent criminal defendants";
2. "Declare that the constitutional rights of Wisconsin's indigent criminal defendants are being violated by the State on an ongoing basis, and provide a deadline for the State to move this Court for approval of specific modifications to the structure and operation of the State's indigent defense system";
3. "Enjoin the State from continuing to violate the rights of indigent defendants by providing constitutionally deficient representation";
4. "[R]equir[e] the State to propose, for this Court's approval and monitoring, a plan to develop and implement a statewide system of public defense" consistent with the state and federal constitutions;
5. "[R]equire[] the State to propose, for this Court's approval and monitoring, uniform workload and performance [standards] for attorneys representing indigent criminal defendants";
6. "[E]stablish[] minimum standards of courtroom experience or mentorship" for attorneys to "be certified to represent indigent criminal defendants;" and
7. "[B]ar[] the use of fixed-fee contracts in the delivery of indigent defense services in the State of Wisconsin."

(Am. Compl. (dkt. #10) 25-26.) As in *O'Shea*, although plaintiffs do not directly ask the court to enjoin ongoing criminal proceedings, such sweeping relief would result from enforcement of plaintiffs' proposed injunction. *See Luckey*, 976 F.2d at 677-78 (acknowledging that while plaintiffs did not challenge individual convictions or prosecutions, it was "nonetheless clear that plaintiff[s] intend to restrain every indigent prosecution and contest every indigent conviction until the systemic improvements they seek are in place").

Regardless, the relief requested would constitute an "intrusive and unworkable

supervision of state judicial processes." *Gardner*, 500 F.2d at 715. Indeed, an injunction addressing any of these items would effectively require the court "to engage in an ongoing audit of the criminal cases in [the State of Wisconsin.]" *Yarls*, 231 F. Supp. 3d at 136. *See also Luckey*, 976 F.2d at 677 (rejecting plaintiffs' argument that "*Younger* only bars federal courts from restraining ongoing state court prosecutions and does not bar the prospective relief they seek," because "a decree of the sort requested . . . would, inevitably, interfere with every state criminal proceeding" and the state courts could consider these claims). Even on its face, the injunction requested by plaintiffs would require this court to approve and monitor a restructuring and redevelopment of the State's public defense system, including workload, experience requirements, and performance standards. *See Luckey*, 976 F.2d at 678-79 (explaining that "the potential enforcement difficulties of any order reforming such an integral aspect of a state criminal justice process as the indigent defense system would be significant" and could require the court "to review ongoing state proceedings[,] . . . interrupt[ing] them if the standards are not being followed").

Federalism concerns also caution against this court issuing plaintiffs' requested declaratory relief. *See Samuels v. Mackell*, 401 U.S. 66, 69 (1971) (extending *Younger* abstention to declaratory actions and recognizing that "under ordinary circumstances the same considerations that require the withholding of injunctive relief will make declaratory relief equally inappropriate"); *see also Yarls v. Bunton*, 231 F. Supp. 3d 128, 131 (M.D. La. 2017) ("Any declaratory judgment or injunction entered by this Court would inevitably lead it to become the overseer of the Orleans Parish criminal court system, a result explicitly condemned by the United States Supreme Court in *Younger* and *O'Shea*."). These

11

federalism concerns are particularly acute with respect to plaintiffs' claims of violations of the Sixth Amendment guarantee to a speedy trial, given that the Supreme Court has held "[t]he sole remedy for a violation of the speedy trial right [is] dismissal of the charges." *Betterman v. Montana*, 136 S. Ct. 1609, 1611 (2016). A declaration from this court that the speedy trial rights of plaintiffs and their class are being violated could directly call into question the validity of both past and present criminal proceedings, a result that clearly violates the principles of federalism articulated in *Younger*.

Finally, judicial intervention into the Wisconsin public defender system would be particularly imprudent given the state's current and active efforts to reform the system. As noted above, the Justices of the Wisconsin Supreme Court, in their administrative order raising the rate for court-appointed counsel just last year, wrote that they were "deeply concerned about the impact of prolonged underfunding of the SPD." Wis. S. Ct. Order 17-06, 17 (issued June 27, 2018, eff. Jan. 1, 2020). Although declining to declare the SPD rate "unreasonable" in those proceedings, they did so "trust[ing] that legislature will work with the courts" and other state actors to ensure adequate funding for the SPD in order "to forestall what is clearly, an emerging constitutional crisis." *Id.* at 14-15. Moreover, the Wisconsin Legislature has apparently gotten the message; in February, 2019, lawmakers introduced promising proposals to raise the rate of pay for state public defenders,[7] and in

---

[7] Riley Vetterkind, *Assembly Republicans Call for $50 Million Criminal Justice Package*, Wis. St. J. (Feb. 19, 2019), https://madison.com/wsj/news/local/govt-and-politics/assembly-republicans-call-for-million-criminal-justice-package/article_0b315a71-c9a7-57a6-8558-33d8fcf8ad93.html.

May, 2019, the Joint Finance Committee passed a $25.6 million plan to do just that.[8] Governor Evers and Wisconsin Supreme Court Chief Justice Patience Roggensack have also expressed their support.[9]

In *Younger*, the Supreme Court wrote that federalism requires "sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." 401 U.S. at 44. While this court may be anxious to protect plaintiffs' and others' constitutional rights and to find a solution to the problems faced by Wisconsin's public defender system, plaintiffs' requested relief is neither sufficiently constrained nor timely, as it would improperly entangle this court in state criminal proceedings and violate principles of comity, especially given ongoing reform efforts within the state. According, the court will abstain from granting plaintiffs' claims for equitable relief.[10]

In addition to requesting equitable relief, plaintiffs also purport to seek monetary damages under both federal and state law. Although the Supreme Court has left open the

---

[8] Kelly Meyerhofer, *Budget Committee Votes to Boost District Attorney, Public Defender Pay*, Wis. St. J. (May 30, 2019), https://madison.com/wsj/news/local/govt-and-politics/budget-committee-votes-to-boost-district-attorney-public-defender-pay/article_8111abd4-94d2-547f-85da-152009fda5b5.html.

[9] Vetterkind, *supra*.

[10] Of course, the court does so without prejudice to a more narrowly tailored lawsuit should efforts to address the rate of pay to attorneys appointed by the SPD fail before the State Legislature, Governor and Supreme Court fail.

question of *Younger* abstention's application to damages actions, *see Juidice v. Vail*, 430 U.S. 327, 399 n.16 (1977), the Seventh Circuit has held that *Younger* principles apply where adjudication of damages claims would disrupt ongoing state proceedings. In *Simpson v. Rowan*, 73 F.3d 134 (7th Cir. 1995), the Seventh Circuit concluded that *Younger* required the court to abstain from adjudicating plaintiff's damages claim, even though plaintiff had already been convicted. *Id*. at 138. Specifically, the court found a "federal damage action raises constitutional issues that are potentially subject to adjudication in his appeal to the state supreme court." *Id.* Similarly, in *Gakuba v. O'Brien*, 711 F.3d 751 (7th Cir. 2013), the Seventh Circuit held that *Younger* principles applied to plaintiff's § 1983 damages claim alleging violations of his Fourth Amendment rights as the federal claim "involve[d] constitutional issues that may be litigated during the course of his criminal case." *Id*. at 753.

Here, plaintiffs purport to seek damages "suffered as a result of the deprivation of their constitutionally-mandated rights." (Am. Compl. (dkt. #10) 26.) As with *Simpson* and *Gakuba*, plaintiffs' damages request would require federal adjudication of issues that may be litigated during the course of their criminal proceedings. *Younger* principles, therefore, require the court to abstain from those claims as well.

Finally, the court will decline to exercise jurisdiction over plaintiffs' remaining damages claims under the Wisconsin Constitution. Under 28 U.S. Code § 1367, district courts may decline to exercise supplemental jurisdiction over a state law claim if the court has dismissed all claims over which it has original jurisdiction. The Seventh Circuit has recognized a "sensible presumption that if the federal claims drop out before trial, the

district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007) (emphasis omitted). Here, because the court has dismissed all federal claims and because nothing in this case counters the presumption against retention, the court dismisses plaintiffs' state law damages claims.

ORDER

IT IS ORDERED that:

1) Defendants' motion to dismiss (dkt. #11) is GRANTED.

2) The clerk of court is directed to CLOSE this case.

3) The motion to intervene (dkt. #23) is DENIED AS MOOT.

Entered this 18th day of September, 2019.

                      BY THE COURT:

                      /s/
                      _____
                      WILLIAM M. CONLEY
                      District Judge